# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KENNY U. RAYMOND, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 11-CV-01088  (KBJ) |
| | ) |
| THE ARCHITECT OF THE CAPITOL, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Kenny Raymond ("Plaintiff" or "Raymond"), a 56-year-old African-American man who is originally from Jamaica, has worked as an employee of Defendant Architect of the Capitol ("Defendant" or "AOC") since 1975.  Raymond alleges that he was not selected for a higher-grade position within the agency due to discrimination based on his national origin and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (Count I), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634 (Count II), as made applicable to Raymond through the Congressional Accountability Act ("CAA"), 2 U.S.C. §§ 1401-1416.  (*See* Compl., ECF No. 1.)  The gravamen of Raymond's complaint is that a certain supervisor who had long discriminated against him was on the panel that made the hiring decision at issue.

Pending before the Court is Defendant's motion for summary judgment.  (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 18, at 1.)[1]  In that motion, Defendant

---

[1] Page numbers throughout refer to the numbers assigned by the Court's electronic filing system.

maintains that all of the individuals who were involved in the decision-making process independently concluded that Raymond was less qualified than the selected applicant based on his on-the-job experience and interview performance, and that this explanation constitutes a legitimate, non-discriminatory reason for the hiring determination. Because Raymond has failed to produce sufficient evidence to show that Defendant's asserted reason for the non-selection was pretext for discrimination, Defendant's motion for summary judgment will be **GRANTED**. A separate order consistent with this opinion will follow.

## I.    BACKGROUND

### A. Factual Background

The following facts are undisputed, unless otherwise noted. Raymond is an African-American male of Jamaican descent who was 56 years old at the time of the alleged discrimination. (Def.'s Statement of Material Facts ("Def.'s Facts"), ECF No. 18-1, ¶ 1.) Raymond began working for the AOC in 1975. (Compl. ¶ 8.) Beginning in 2001, he worked in the House Office Buildings ("HOB") as a Labor Supervisor, at a salary grade level of WS-5. (*Id.* ¶ 2; Excerpts of Dep. of Kenny Raymond ("Pl.'s Dep. I"), ECF No. 18-9, at 2.)[2] This case stems from the AOC's decision in 2010 to select another AOC Labor Supervisor, Cordell Shields, for a promotion to the higher-grade

---

[2] Employees of the federal government are paid salaries based on the assigned "grade level" of their positions; generally, the higher the grade level, the higher the salary. *See* Pay & Leave: Pay Systems, Federal Wage System Overview, OPM.GOV, http://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/ (last visited June 23, 2014).

position of Laborer (Recycler) General Supervisor—a position for which Raymond also had applied. (*See* Def.'s Mot. at 3-4; Def.'s Facts ¶¶ 4, 7, 10.)[3]

### 1. The AOC's Job Selection Process

The AOC's process for selecting Shields for promotion to the Laborer (Recycler) General Supervisor position followed the standard procedure that the AOC employs for all hiring and promotion decisions. In short, when a position becomes available, the AOC's Human Resources Office receives and reviews applications and identifies the best-qualified applicants, who are then offered interviews that are conducted by a three-person panel. (*See* Def.'s Facts ¶ 22.) During the interviews, the panel gives each applicant the same 11 predetermined interview questions. (*Id*.) Each interview panelist has his own score sheet and independently scores each applicant's responses to the 11 questions on a scale of 1 to 5 points—5 being the highest rating. (*Id*.) After all of the interviews, the panelists independently rank the applicants' responses to each of the 11 questions, and each panelist adds up the cumulative score for each applicant. (*Id*.) Only then do the panelists reveal their scores to each other and discuss the applicants as a group. (*Id*.) Based on the scores, the hiring panel as a whole recommends the best-qualified applicant to the AOC Superintendent for hire. (*Id.* ¶ 23.) And if the Superintendent concurs with the recommendation, the selected applicant is hired. (*Id.*)

In the instant case, the Laborer (Recycler) General Supervisor position opened in August 2010, and the advertisement for the vacancy listed skills and qualifications germane to the position, including the requirement that the successful applicant needed

---

[3] Raymond held a grade level of 5 and sought a promotion to level 8. (*Compare* Appl. of Kenny Raymond ("Raymond Appl."), ECF No. 18-8, at 1 (noting that his current job title as labor supervisor was grade 5), *with* Laborer Gen. Supervisor Job Vacancy Announcement ("Job Posting"), ECF No. 18-17, at 1 (noting that the general supervisor position was grade 8).)

to be able to "provide[ ] feedback and periodically evaluate[ ] employee performance"; provide "advice, counsel and/or instruction to staff members"; and conduct other management and supervisory functions. (Laborer Gen. Supervisor Job Vacancy Announcement ("Job Posting"), ECF No. 18-17, at 1-2.) Raymond and Shields were among the various applicants for the position. (*See* Appl. of Kenny Raymond ("Raymond Appl."), ECF No. 18-8 at 1; Appl. of Cordell Shields ("Shields Appl."), ECF No. 18-12, at 1.) As required, both Raymond and Shields listed on their applications the prior awards and job training that they had received in their careers thus far. (Raymond Appl. at 2; Shields Appl. at 7.) Raymond listed three awards and four training courses on his application. (Raymond Appl. at 2.) Shields listed 15 awards and 13 training courses on his application. (Shields Appl. at 7.) Additionally, both applicants included the three most recent performance ratings they had received. (Raymond Appl. at 6; Shields Appl. at 8-9.) Raymond was rated "Fully Successful" in his three most recent performance ratings. (Raymond Appl. at 6.) Shields, on the other hand, was rated "Outstanding" in his. (Shields Appl. at 8-9.)

The AOC Human Resources Office selected Raymond and Shields, along with four other applicants, as the best qualified, and referred the six individuals to a three-person panel for an interview. (Referral List, ECF No. 18-11, at 1.) The panel consisted of a significant cast of AOC characters, including one person who had worked with Raymond in the past. That person was Sterling Thomas, an Assistant Superintendent in the HOB who had been Raymond's second-line supervisor since 2002. (Pl.'s Dep. I at 2; Def.'s Facts ¶ 3; Dep. of Sterling Thomas ("Thomas Dep."),

ECF No. 18-13, at 2; Compl. ¶ 5.)[4]  Also on the selection panel was Thomas Carroll,

one of Sterling Thomas's supervisors, who served as the Deputy Superintendent of the

HOB.  (Decl. of Thomas Carroll ("Carroll Decl."), ECF No. 18-22, ¶¶ 2-3.)  The third

member of the panel was William Wood, Jr., the Assistant Superintendent for the

Tenant Services Division at the HOB.  (Decl. of William S. Wood, Jr. ("Wood Decl."),

ECF No. 18-26, ¶ 2.)[5]

It is undisputed that Thomas, Carroll, and Wood, interviewed each of the six

applicants.  (Carroll Decl. ¶ 3; Wood Decl. ¶ 2; Thomas Dep. at 5.)  Moreover, in

accordance with the standard process, each of the three panelists separately ranked the

applicants' answers to the 11 interview questions and recorded his applicant rankings

on a separate score sheet.  (*See* Carroll Rating Sheet, ECF No, 18-5, at 1; Wood Rating

Sheet, ECF 18-21, at 1; Thomas Rating Sheet, ECF No. 18-16, at 1; *see also* Wood

Decl. ¶ 4; Carroll Decl. ¶ 4.)  The record evidence also indicates that prior to

interviewing and ranking the applicants, none of the interview panelists conferred with

---

[4] As explained below, Raymond maintains that Thomas was the perpetrator of ongoing discrimination against him on the basis of national origin and age.

[5] Raymond contends that the sham affidavit rule bars this Court from considering the declarations of Thomas Carroll and William Wood that are attached to Defendant's summary judgment motion because, in Raymond's view, these affidavits conflict with the affiants' prior deposition testimony.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 24, at 6.)  The sham affidavit rule "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the 'shifting party can offer persuasive reasons for believing the supposed correction' is more accurate than the prior testimony."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991)).  The sham affidavit rule applies in cases where an affidavit provided as a supplement to sworn testimony "clearly contradict[s]," rather than clarifies, previous sworn testimony and provides no explanation for the change in testimony.  *See St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 160 (D.D.C. 2008) (quoting *Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 930 (D.C. 2003)).  Here, nothing in the Carroll or Wood affidavits "clearly contradicts" either affiant's prior deposition testimony; to the contrary, the affidavits provided here only clarify circumstances that were previously addressed in their depositions.  Accordingly, the sham affidavit rule does not apply, and the Court will consider the affidavits of Thomas Carroll and William Wood.  *See, e.g., Johnson v. Shinseki*, 811 F. Supp. 2d 336, 344 (D.D.C. 2011) (finding that the sham affidavit rule did not apply where defendant's affidavit did not clearly contradict prior sworn testimony and only clarified ambiguous testimony).

one another regarding any of the applicants. (Dep. of William S. Wood, Jr. ("Wood Dep."), ECF No. 18-18, at 4-7; Dep. of Thomas Carroll ("Carroll Dep."), ECF No. 25-2, at 4.) According to Wood's deposition testimony, for example, Wood completed the ratings and rankings for each of the interviewed applicants independently and did not discuss his rankings with any other panel member. (Wood Dep. at 6-7.) Carroll also testified that he did not discuss his scores with his fellow panelists until all of the interviews were over and each panelist had already completed his score sheets. (*See* Carroll Dep. at 4 (noting that he did not discuss scores with other panelists at the close of each interview); *id.* ("[W]hen all the interviews were conducted, then we—everyone had a chance to fill out their score sheets and at that time, there was a discussion.").) In other words, the facts demonstrate that Thomas never discussed Raymond or any of the other applicants with any other member of the selection panel until each panelist had already ranked the applicants.

2. The Panelists' Selection Of Shields Over Raymond

After the panelist's individual rankings were completed, each panelist revealed his scores to the others and the discussion of each applicant's strengths and weaknesses commenced. (Wood Decl. ¶ 4; Carroll Decl. ¶ 4.) It was only upon the revelation of the scores that the panelists learned that they had each independently given Cordell Shields the highest score. (Wood Decl. ¶ 4; Carroll Decl. ¶ 4.) According to two of the panelists, there was a consensus that Shields was the strongest candidate. (Wood Decl. ¶ 4; Carroll Decl. ¶ 4.)

Each panelist has testified that, in his personal view, Shields performed better than Raymond at the interview because Shields answered the panel's questions with

more specificity.  (*See*, *e.g.*, Wood Decl. ¶ 8 (stating that Shields "was able to articulate that his focus is attention to detail" whereas Raymond had "no clear plan for his first three months"); Carroll Decl. ¶¶ 9-15; Thomas Dep. at 7.)  In addition, Carroll testified that, based on his experiences with Raymond and Shields, Raymond's interview responses "failed to match reality."  (Carroll Decl. ¶ 13.)

The panelists also ranked Shields higher than Raymond based on their personal knowledge of the applicants' on-the-job performance.  For example, Carroll noted that Shields had previously exhibited the type of initiative and problem-solving skills that the higher-level job required.  (*Id.* ¶ 11.)  Giving a specific example, Carroll testified that during a big blizzard, Shields "took the initiative to get the employees fed and was making arrangements for them to stay overnight."  (*Id.*)  In contrast, Carroll noted that, "Mr. Raymond, while present, simply did not exert himself to take the lead."  (*Id.*)

After a period of deliberation, the interview panel recommended Shields for the position.  William Weidemeyer, Superintendent of the HOB, concurred in the recommendation.  (Decl. of William Weidemeyer ("Weidemeyer Decl."), ECF No. 18-25, ¶¶ 1-2), noting that although

> Mr. Raymond has performed his job in a fully successful manner, [he] has not distinguished himself as a proactive leader as compared to Mr. Shields.  Because of Shields'[s] superlative work record, I heartily concurred in his selection for the position of Labor (Recycler) General Supervisor.

(*Id.* ¶¶ 4-5.)  Beyond his own personal experience with the applicants, Weidemeyer also testified that the "information [he] reviewed showed Mr. Shields to be better qualified," as did the applicants' interview performances.  (*Id.* ¶ 5.)

Several days after the interviews, Raymond learned that the AOC had offered Shields the position.  (*See* Thomas Dep. at 9.)

## B.  Procedural History

 After learning of his non-selection, Raymond filed an administrative complaint with the AOC's Office of Compliance, alleging that his non-selection for the Laborer General Supervisor position was the result of unlawful discrimination.  (Compl. ¶ 4.)[6] On June 14, 2011, Raymond filed a complaint in this Court against the AOC alleging that the AOC had violated the anti-discrimination provisions of Title VII and the ADEA with respect to this hiring determination because Sterling Thomas had been on the selection panel (as described above) and Thomas had a long history of discriminating against Raymond, as detailed below.  (*Id.* ¶ 21.)  In the two-count complaint, Raymond alleged that the non-selection constituted discrimination on the basis of his race and national origin (Count I), and also discrimination on the basis of his age (Count II). (*Id.* ¶¶ 23-26.)[7]

### 1.  The Complaint's Allegation Of Discrimination On The Basis Of National Origin

The primary basis for Raymond's contention that the non-selection constituted discrimination on the basis of national origin is the fact that, according to the complaint, "[o]n several occasions prior to the non-selection of the Plaintiff in the case complained about, Sterling Thomas . . . evidenced hostility and dislike for the Plaintiff

---

[6] Defendant does not dispute that Raymond properly exhausted his administrative remedies, including participating in counseling and mediation and receiving a notice of end of mediation, as the CAA requires.  *See* 2 U.S.C. § 1408.

[7] Raymond has since withdrawn his race discrimination claim (*see* Pl.'s Opp'n at 2 n.1); therefore, only the national origin and age discrimination claims remain at issue.

as an African-American male of Jamaican descent." (Compl. ¶ 20.) Although the complaint itself does not provide specifics regarding the alleged prior discriminatory "acts and omissions" of Thomas in this regard (*id.* ¶ 21), the record testimony indicates that the prior instances of discrimination upon which the complaint relies relate largely to discriminatory comments that Thomas allegedly made about Raymond's national origin and age.

During the 2007 football season, for example, Thomas (a Dallas Cowboys fan) allegedly chided Raymond (a Washington Redskins fan) at a staff meeting, asking him: "did your team win today, Jamaican?" (Pl's Dep. I at 3.) Similarly, during the 2010 football season, Thomas allegedly commented on Raymond's Jamaican origin at supervisory staff meetings approximately twice per month, saying things like, "[W]hat [does] this guy know about football . . . he [is] from Jamaica[.]" (*Id.* at 3, 5-6.)[8] In another alleged instance of Thomas's discriminatory statements, Raymond purportedly brought Thomas's assistant a beef patty for lunch one day, and the next day Thomas asked Raymond why Raymond did not get Thomas any beef patty. (*Id.* at 6.) Raymond interpreted this conversation as a reflection of his Jamaican origin. (*See id.* at 5.)[9] Finally, Raymond points to one incident in which he needed to change his password in order to use an AOC computer program, and Thomas allegedly typed the password "Jamaica" for Raymond's account. (Pl.'s Interrog. Resp., ECF No. 18-6, at 1; Excerpts

---

[8] Defendant disputes that Thomas ever made any such comments or otherwise expressed any hostility towards Raymond based on his national origin (Def.'s Answer, ECF No. 7, ¶ 20; *see also* Thomas Dep. at 6), and none of the declarations or other sworn statements in the record besides Raymond's corroborates Raymond's contention that any such statements were made.

[9] Like the previous incidents, there is no evidence in the record, other than Raymond's own statement, to corroborate this allegation.

of Dep. of Kenny U. Raymond ("Pl.'s Dep. II"), Ex. 2 to Pl.'s Opp'n, ECF No. 24, at 28.)[10]

    2.  <u>The Complaint's Allegations Of Discrimination On The Basis Of Age</u>

In addition to the allegation that Raymond's non-selection resulted from illegal discrimination on the basis of national origin, the complaint also asserts that "the individual selected for the position was a person over whom the Plaintiff clearly and unambiguously had better qualifications, experience, training, education and leadership skills" but that "[s]aid selectee was also much younger than the Plaintiff."  (Compl. ¶¶ 18-19.)  The complaint notes that "Plaintiff has applied for several different promotional opportunities within the [AOC]" (*id.* ¶ 12), and continues:  "Sterling Thomas appears to have made it his mission to assure that the Plaintiff is never promoted[,]" and with respect to the challenged non-selection, "the failure to promote the Plaintiff [over the selected applicant was] a pretext for discrimination."  (*Id.* ¶ 21.)

To support the allegation that age discrimination was a motivating factor behind the selection at issue here, Raymond has testified about prior instances in which Thomas and others allegedly made disparaging comments about his age.  For example, in 2009, at a time when Raymond was forced to use a walking stick at work due to a gout problem, Thomas allegedly stated that Raymond was "getting old" and suggested that Raymond use his many accrued hours of sick leave instead of coming to work in such a condition.  (Pl.'s Dep. I at 8.)  Furthermore, at supervisor meetings, Thomas allegedly commented on Raymond's many accrued hours of sick leave, contending that

---

[10] Thomas denied using "Jamaica[ ]" as a password in his sworn deposition testimony (Thomas Dep. at 6), and, when asked at his deposition to identify any colleague who might have overheard the conversation, Raymond was unable to do so.

the number was high as a result of his age. (*Id.*) Indeed, according to Raymond, Thomas "joki[ngly]" commented on Raymond's age approximately twice each month. (*Id.* at 8-9)[11] Raymond also testified about a single remark that Cordell Shields—the eventual selectee—made in February or March 2010, during a meeting about a recent blizzard that had caused extra work for the AOC employees in the HOB department. Shields allegedly made a general comment about Raymond's age in front of the employees present, including eventual decision makers Thomas, Carroll, and Weidemeyer. (Pl.'s Dep. I at 5.) As Raymond recalled the incident, Shields told the employees that Raymond was getting older, so the men in the group should perform well so that they could take over his position one day. (*Id.*)[12]

### 3. The Course Of The Instant Litigation

Defendant answered Raymond's complaint on November 21, 2011, denying all allegations of discrimination. (Def.'s Answer, ECF No. 7, ¶¶ 20-22.) The parties then proceeded to engage in extensive discovery, which took place from December 2011 through early 2013. (*See* Scheduling Order, ECF No. 10 (discovery beginning Dec. 25, 2011); Minute Order of Nov. 3, 2012 (extending discovery to January 28, 2013).)

Upon the close of discovery, Defendant filed a motion for summary judgment in which Defendant asserts that it had a legitimate, non-discriminatory reason for selecting

---

[11] Although Raymond stated in his deposition testimony that "other staff members" were present when Thomas made these types of comments, Raymond was unable to provide the name of any staff member who overheard the particular age-related comments alleged. (*See* Pl.'s Dep. I at 5, 8-9.) It appears that Thomas was not questioned about any specific comments he allegedly made related to Raymond's age, and Thomas denied knowing Raymond's age when questioned about it at his deposition. (*See* Thomas Dep. at 6.)

[12] In the declaration that Shields submitted in the context of this case, Shields agrees that he made reference to Raymond's retirement—and, by implication, his age—during a staff meeting. (Shields Decl. ¶ 11.) But according to Shields, he did so to make an example of Raymond's exemplary record of service to the AOC and to encourage other staff members to "step up to the plate" in order to fill higher-level positions like Raymond's once Raymond retired. (*Id.*)

Shields instead of Raymond: simply put, the entire AOC interview panel determined that Shields was more qualified than Raymond, based on the applicants' respective work and interview performances. (Def.'s Mot. at 19, 30.) Defendant further contends that there is no evidence that this rationale is pretext for discrimination. (*Id.* at 15.) Raymond counters that the evidentiary support for Shields's qualifications is itself "specious and suspect"; therefore, any argument that Shields was better qualified is pretext for discrimination. (Pl.'s Opp'n at 5.) Plaintiff also contends that Thomas's prior comments about Raymond's national origin and age are sufficient evidence from which a reasonable juror could infer discrimination. (*Id.* at 5-6.)

## II.    SUMMARY JUDGMENT STANDARD

The Court must grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under Rule 56, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). Although the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in that

party's favor, *see, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position—instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

In determining whether there are genuine issues of material fact for trial, the Court reviews a defendant's motion for summary judgment with a slightly "heightened standard" that reflects caution. *Walker v. England*, 590 F. Supp. 2d 113, 133 (D.D.C. 2008) (citation omitted). Such caution is warranted because of "the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent," *Nurriddin v. Bolden*, No. 04-2052, 2014 WL 1648517, at *5 (D.D.C. Apr. 25, 2014) (citation omitted), and also because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted). Nevertheless, despite the fact that "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations" with competent evidence showing a genuine issue for trial. *Walker*, 590 F. Supp. 2d at 132-33 (quoting *Morgan v. Fed. Home Loan. Mortg. Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001)); *see also Marshall v. James*, 276

F. Supp. 2d 41, 47 (D.D.C. 2003) (noting that, even though courts must proceed with caution, summary judgment is still used in discrimination cases).

## III.  ANALYSIS

Raymond contends that Thomas had long discriminated against him on the basis of national origin and age and that, given Thomas's presence on the promotion selection panel, a reasonable jury could infer that the AOC discriminated against him in selecting Shields over him for the promotion.  (*See* Compl. ¶¶ 21, 23-26; Pl.'s Opp'n at 3.) Defendant has advanced a non-discriminatory reason for the selection—*i.e.*, that Shields was simply more qualified than Raymond—and contends that there is no genuine issue of material fact regarding whether this rationale was pretext for discrimination.  As explained below, this Court concludes that the Raymond has failed to establish that the AOC's proffered reason for the non-selection was pretext given the record evidence of Shields's superior qualifications and the fact that each panelist independently arrived at the conclusion that Shields was the better man for the job.

### A.  Applicable Legal Standards For Establishing Discrimination

Raymond maintains that the non-selection at issue here constituted discrimination in violation of Title VII and the ADEA.  (Compl. ¶ 1.)  As an AOC employee, Raymond can only bring such claims under the CAA, which was enacted in 1995 to provide a forum for employees of the legislative branch of the federal government to challenge their employers' alleged discriminatory actions.  *See* 2 U.S.C. § 1301(3).  The CAA makes certain federal anti-discrimination statutes expressly applicable to legislative branch offices, including, in relevant part, Title VII and the ADEA.  2 U.S.C. § 1302(a).  When construing discrimination claims under the CAA,

courts incorporate much of the substantive law of Title VII. *See Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009); *see also Hyson v. Architect of the Capitol*, 802 F. Supp. 2d 84, 97 (D.D.C. 2011) (citations omitted); *Gordon v. Office of the Architect of the Capitol*, 750 F. Supp. 2d 82, 90 (D.D.C. 2010) ("Although not necessarily binding precedent, courts when construing the CAA often consider as persuasive case law interpreting Title VII." (citation omitted)).

In cases that involve allegations of national origin or age discrimination, courts in this jurisdiction typically apply the familiar burden-allocation scheme that the Supreme Court adopted in the case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See id.* at 802-03; *see also Stewart v. Ashcroft*, 352 F.3d 422, 428 (D.C. Cir. 2003) (applying *McDonnell Douglas* to Title VII discrimination claims); *Krodel v. Young*, 748 F.2d 701, 705 (D.C. Cir. 1984) (applying *McDonnell Douglas* to ADEA discrimination claims). Pursuant to this scheme, a plaintiff must first demonstrate by a preponderance of evidence the existence of a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).[13] If the plaintiff is able to establish a prima facie case, then the burden shifts to the defendant to offer a non-discriminatory reason for the challenged determination. *See McDonnell Douglas*, 411 U.S. at 802-03. And once such reason is offered, the burden shifts back to the plaintiff

---

[13] To prove a prima facie case of discriminatory non-selection, a plaintiff must prove that:

> (1) he is a member of a protected class; (2) he applied for and was qualified for an available position; (3) despite his qualifications he was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants.

*Jackson v. Gonzalez*, 496 F.3d 703, 707 (2007) (quoting *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *see also Walker*, 590 F. Supp. 2d at 137 (quoting *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 n.1 (D.C. Cir. 2008)); *see also Barnett*, 715 F.3d at 358 (noting that the D.C. Circuit analyzes claims under Title VII and the ADEA in the same way).

to demonstrate that the employer's reason was actually pretext for discrimination.  *See id.* at 804.  Significantly, the D.C. Circuit has clarified that an analysis of the first step in the *McDonnell Douglas* framework—assessment of the prima facie factors—is "almost always irrelevant" and is "largely [an] unnecessary sideshow."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492, 494 (D.C. Cir. 2008).  Thus, where, as here, the defendant employer has asserted a legitimate, non-discriminatory reason for an employment decision, there is "one central question" that the district court must resolve:  whether the employee has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on [an improper] basis[.]"  *Id.* at 494.

In non-selection cases, there are typically three ways a plaintiff can successfully establish that a reasonable jury could find that the employer's stated reason for the challenged action was pretext for discrimination.  First, the plaintiff can demonstrate that there is a significant qualifications gap between him and the selected candidate.  Notably, however, for the Court to infer discrimination on the basis of the candidates' qualifications alone, "the qualifications gap must be great enough to be inherently indicative of discrimination."  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (citing *Lathram v. Snow*, 336 F.3d 1085, 1091 (D.C. Cir. 2003)); *Hamilton v. Geithner*, 666 F.3d 1344, 1352 (D.C. Cir. 2012); *see also Hyson*, 802 F. Supp. 2d at 98 (where "the parties' quarrel focuses on a dispute over the relative qualifications of candidates for a particular position, the courts have consistently declined to serve as a super-personnel department that reexamines an entity's business decisions" (internal

quotation marks omitted) (quoting *Holcomb*, 433 F.3d at 897)).  Second, inconsistencies or irregularities in an employer's established hiring process may support a finding of discriminatory non-selection.  *See Lane v. Vasquez*, 961 F. Supp. 2d 55, 67 (D.D.C. 2013) (the employer's "adherence to or departure from internal hiring procedures is a factor that the trier of fact may deem probative and choose to consider in determining the true motivation behind the hiring decision" (quoting *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982))).  Third and finally, a plaintiff "can also avoid summary judgment" if he can present "other evidence, either direct or circumstantial, that permits an inference of discrimination."  *Hyson*, 802 F. Supp. 2d at 98 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 n.11 (D.C. Cir. 1998) (en banc)).  In the absence of direct evidence of discrimination—*i.e.*, an admission that the selection determination was actually motivated by a candidate's protected characteristic—circumstantial evidence of discrimination may include decision makers' other comments, interview summary sheets, or other sworn testimony.  *See, e.g.*, *Aka*, 156 F.3d at 1298-99 (finding that the content of interview summary sheets and affidavits provided evidence of discrimination.)

### B. Raymond Has Failed To Establish That A Reasonable Jury Could Conclude The AOC's Proffered Reason For The Non-Selection Was Pretext For Discrimination

The AOC maintains that each of the three panel members in charge of making the challenged selection decision independently concluded that Shields was more qualified for the position than Raymond, based on the applicants' relative work and interview performance.  (Def.'s Mot. at 1, 32.)  Thus, the only question before the Court is whether Raymond has produced sufficient evidence to rebut this legitimate,

non-discriminatory reason or to show that it was mere pretext. *See Brady*, 520 F.3d at 494. In light of the applicable legal standards discussed above and for the following three reasons, this Court finds that Raymond has failed to demonstrate that the Defendant's legitimate reason for selecting Shields was pretext for discrimination.

First, there is no significant gap in qualifications that would raise any inference of discrimination. As noted, to give rise to an inference of discrimination, "the plaintiff must be 'substantially more qualified' than the successful candidate to perform the duties listed in the vacancy announcement, and the non-selected candidate must have a 'stark superiority of credentials.'" *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 152 (D.D.C. 2013) (quoting *Porter v. Shah*, 606 F.3d 809, 815-16 (D.C. Cir. 2010)); *see also Grosdidier*, 709 F.3d at 25 ("To prevail on a relative qualifications claim, [the plaintiff] must show that she is '*significantly* better qualified for the job than [the applicant] ultimately chosen." (emphasis in original) (second alteration in original)). There is nothing in the record that establishes that Raymond is "substantially" or "significantly" better qualified than Shields, and in fact, when one compares the two applicants' awards and job training, the record clearly indicates otherwise. (*Compare, e.g.*, Shields Appl. at 7-9 (noting that Shields had won 15 awards, completed 13 training courses, and received "Outstanding" ratings), *with* Raymond Appl. at 2-6 (noting that Raymond had won 3 awards, completed 4 training courses, and received "Fully Successful" ratings).)[14] The panelists' impressions of the applicants' interviews

---

[14] Raymond suggests that Shields fabricated the training and awards listed on his application, calling Shields's resume "marketing puffery" and stating that there is "nothing to authenticate as true either the training or awards [Shields] received." (Pl.'s Opp'n at 5-6.) But Raymond offers nothing other than his own accusations that Shields's statements regarding his training or awards are untrue. Such bald allegations are insufficient to establish a genuine issue of fact where, as here, Shields listed his awards, training, and experience on a form that was submitted to panelists who were familiar with him and his

similarly reflects that Shields was a better performer than Raymond. (*See* Wood Decl. ¶ 8 (explaining that while "Shields was able to articulate" how he would stress the importance of "attention to detail" to his employees, Raymond's response was vague and express "no clear plan"); Carroll Decl. ¶¶ 10, 14 (explaining that Shields gave more specific answers than Raymond).) And the panelists had their own prior experiences with, and observations of, Shields and Raymond to draw upon as well. (*See* Wood Decl. ¶ 5 (testifying that while Shields worked independently, Raymond needed more direction); Carroll Decl. ¶ 11 (noting that Shields showed initiative while Raymond did not); *see also id.* (Shields was better suited for this supervisory and management position based on the "initiative" and "lead[ership]" he exhibited compared to Raymond's more passive style).) Indeed, rather than demonstrating Raymond's superior qualifications in a manner that raises an inference of discrimination, the record evidence confirms the correctness of the panelists' considered independent judgment that, on a qualifications scale, Shields should be ranked more highly than Raymond.[15]

Second, there is no dispute that the AOC followed its ordinary procedures in making the selection determination at issue here. It is clear on this record that the AOC followed its usual hiring procedures: the interview panelists rated each applicant

---

work. The panel accepted the representations as true, and in the absence of proof to the contrary, so will this Court.

[15] Raymond insists nonetheless that his resume shows he was better qualified than Shields (*see* Pl.'s Opp'n at 6; Pl.'s Dep. II. at 65), but it is well established that a plaintiff's own perception of his superior qualifications does not outweigh the record evidence to the contrary. *See Ficken v. Clinton*, 771 F. Supp. 2d 79, 84 (D.D.C. 2011) ("[A] plaintiff's personal evaluation of his own qualifications and performance is insufficient to rebut a defendant's legitimate, non-discriminatory reason for his non-selection." (citations omitted)); *see, e.g.*, *Jo v. District of Columbia*, 582 F. Supp. 2d 51, 62-63 (D.D.C. 2008) ("Although Plaintiff clearly values his own credentials and experiences, a plaintiff's subjective assessment of his own record is largely irrelevant." (citations omitted)); *Spelke v. Gonzales*, 516 F. Supp. 2d 76, 80 (D.D.C. 2007) (noting that the "plaintiff's subjective self-assessment" of his qualifications "does not defeat defendant's offering a legitimate, nondiscriminatory reason for the non-selection of plaintiff" (internal quotation marks and citation omitted)).

independently, completed separate ranking sheets, and did not confer with one another in their ratings. Using this process, all three panelists chose Shields as the better-qualified candidate, and for good reason (*see supra*). Raymond has not offered any evidence to suggest that Defendant strayed from the usual hiring path in any way, let alone in a manner that renders its explanation for hiring Shields "unworthy of belief." *Porter*, 606 F.3d at 816 (citation omitted).

Third and finally, this Court concludes that no valid inference of discrimination with respect to the selection arises from any other evidence that Raymond presents, including, in particular, Raymond's contention that panelist Thomas had previously demonstrated discriminatory animus towards Raymond in the workplace by making comments related to his national origin and age. While discriminatory comments made by one member of a selection committee *may* raise an inference of pretext, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000), whether such an inference arises depends on the particular circumstances of the committee's determination, *id.*, and this Court finds that the circumstances here do not permit an inference that Thomas's alleged prior discriminatory statements tainted the selection process for several reasons. First of all, there is no record evidence (other than Raymond's own testimony) to support the vigorously disputed contention that Thomas actually made any discriminatory statements about Raymond. This threshold hurdle is one that Raymond would need to surmount successfully before he could even begin to assert that Thomas's discriminatory animus tainted the selection process. Moreover, even if it could be shown that Thomas had previously made comments about Raymond's national origin and age, there are no facts in the record that suggest that any such discriminatory

thoughts or animosity necessarily carried over into Thomas's *own* assessment of Raymond's qualifications in the context of the selection process, much less that such discriminatory animus influenced the assessments of Thomas's fellow panelists. [16]

And it is this latter point that most clearly reveals the flawed nature of Raymond's pretext argument.  It is undisputed that Thomas was not the *sole* decision maker, and there is no genuine issue regarding the fact that the panelists reached their selection decisions entirely independently.  Independent assessments of candidate qualifications in the form of separate ratings was an established part of the AOC hiring process, and under the circumstances presented here, it is clear that the independent assessment process effectively insulated the selection determination from challenge based on Thomas's alleged discriminatory animus.  *See Hampton v. Vilsack*, 685 F.3d 1096, 1101-02 (D.C. Cir. 2012) (affirming the district court's grant of summary judgment to the employer where the termination decision was based on an "independent assessment" of the plaintiff's conduct and was not influenced by the plaintiff's supervisor who was alleged to harbor discriminatory animus); *Hall v. Giant Food*, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999) (evidence of one supervisor's discriminatory remarks is not probative of discrimination where the decision maker "made an independent assessment" of the plaintiff's conduct); *cf. George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (finding evidence of discrimination where a supervisor is alleged to harbor discriminatory animus and to have "influenced" the decision maker's ultimate determination (citation omitted)); *Griffin v. Wash. Convention Ctr.*, 142 F.3d

---

[16] It is well established that, while a plaintiff's history with an alleged discriminatory supervisor may be "relevant" to the question of whether discrimination was the motivation for a particular hiring decision, that alone is "not enough to impute sinister motivations" for that determination.  *See, e.g.*, *Porter*, 606 F.3d at 816 (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)).

1308, 1310 (D.C. Cir. 1998) (evidence of a colleague's bias is relevant where "the ultimate decision maker is not insulated from th[at employee's] influence" (citation omitted)). Significantly, Raymond nowhere alleges that either of the other two panelists, or for that matter, HOB Superintendent Weidemeyer, ever harbored any ill will towards him or discriminated against him in any way, and there is no evidence that Thomas's alleged discriminatory animus "influenced the committee's deliberations by portraying [the plaintiff's] performance to the committee in the worst possible light." *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). And in the absence of such evidence, the Court concludes that there is no genuine issue of material fact about the independent and untainted nature of the evaluations of two of the three panel members, and thus the non-discriminatory nature of the selection at issue.[17]

In sum, nothing in the record regarding the relative qualifications of Shields and Raymond or the selection process used to fill the Laborer (Recycler) General Supervisor Position raises any inference of discrimination, nor can such an inference be based either on a deviation in the hiring process (there was none) or on Thomas's allegedly discriminatory remarks made earlier and in a different context. Raymond would like to move forward with his discrimination case based on his belief that Thomas was a discriminatory actor, but even if it can be shown that Thomas harbored discriminatory animus, there is no dispute that the other two panelists independently concluded that the selected applicant was better-qualified (a finding that the record

---

[17] The only possible factual basis in the record for any contention that the panel may have been improperly influenced is Raymond's testimony that Cordell Shields mentioned Raymond's age in a disparaging way during a February 2010 meeting that Thomas, Carroll, and Weidemeyer attended. (Pl.'s Dep. I at 5.) But there is no evidentiary support for any conclusion that those individuals even *heard* or otherwise acknowledged those stray remarks, which were made months earlier and in a different context, and thus, there is no basis for any inference that those remarks influenced the panel's selection decision in any way. (*Cf.* Shields Decl. ¶¶ 10-11.)

confirms), and the final decision maker (the Superintendent) heartily concurred with that conclusion. Thus, there is no genuine issue of material fact as to whether the panel's selection of Shields was truly motivated by discrimination against Raymond, nor has any material question been raised regarding whether Thomas's alleged discriminatory animus somehow tainted the challenged selection process.

## IV.    CONCLUSION

For the reasons stated above, Raymond has failed to show that Defendant's asserted reason for selecting Shields was a pretext for discrimination, and Defendant's motion for summary judgment must be **GRANTED**. Summary judgment will be entered in favor of Defendant pursuant to the separate order that accompanies this memorandum opinion.

DATE:  June 23, 2014                          *Ketanji Brown Jackson*
                                              KETANJI BROWN JACKSON
                                              United States District Judge